No. 22-14234

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

A.W. BY AND THROUGH J.W., E.M. BY AND THROUGH B.M, M.F BY
THROUGH J.C., & D.G. BY AND THROUGH D.G.,
*Plaintiffs-Appellants,*

v.

COWETA COUNTY SCHOOL DISTRICT & CHRISTI HILDEBRAND,
*Defendants-Appellees*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
CIVIL ACTION NO. 3:21-CV-00218-TCB

**CORRECTED BRIEF OF *AMICI CURIAE* DISABILITY RIGHTS AND
OTHER CIVIL RIGHTS ORGANIZATIONS SUPPORTING
PLAINTIFFS-APPELLANTS AND IN SUPPORT OF REVERSAL**

Richard D. Salgado
  *Counsel of Record*
Marina Stefanova
Jordan Kazlow
Kaylynn Webb
MCDERMOTT WILL & EMERY LLP
2501 N. Harwood St., Ste. 1900
Dallas, Texas 75201
Tel: 214-210-2797

*Counsel for Amici Curiae Alabama Disabilities Advocacy Program,
Autistic Self Advocacy Network, Center for Public Representation,
Disability Rights Bar Association, Disability Rights Education & Defense
Fund, Disability Rights Florida, Education Law Center-PA, Georgia
Advocacy Office, Judge David L. Bazelon Center for Mental Health Law,
National Association of Rights Protection and Advocacy, National Center
for Learning Disabilities, National Disability Rights Network, and
National Women's Law Center*

**A.W. BY AND THROUGH J.W., ET AL. V. COWETA COUNTY
SCHOOL SYSTEM, ET AL.**

### CERTIFICATE OF INTERESTED PERSONS
### AND CORPORATE DISCLOSURE STATEMENT

*Amici curiae* Alabama Disabilities Advocacy Program, Autistic Self Advocacy Network, Center for Public Representation, Disability Rights Bar Association, Disability Rights Education & Defense Fund, Disability Rights Florida, Education Law Center-PA, Georgia Advocacy Office, Judge David L. Bazelon Center for Mental Health Law, National Association of Rights Protection and Advocacy, National Center for Learning Disabilities, National Disability Rights Network, and National Women's Law Center are nonprofit organizations and do not issue stock. Pursuant to Federal Rule of Appellate Procedure 26.1, *Amici* state that none of them has parent corporations, and no publicly held corporation owns 10% or more of the stock of any *Amici*.

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, *Amici* state that the following persons and entities have an interest in the outcome of the case and this appeal.

## A.W. BY AND THROUGH J.W., ET AL. V. COWETA COUNTY SCHOOL SYSTEM, ET AL.

*Judges*

    1.    The Honorable Timothy C. Batten, Sr., Chief Judge, U.S. District Court for the Northern District of Georgia.

*Amici Curiae*

    2.    Alabama Disabilities Advocacy Program

    3.    Autistic Self Advocacy Network

    4.    Center for Public Representation

    5.    Disability Rights Bar Association

    6.    Disability Rights Education & Defense Fund

    7.    Disability Rights Florida

    8.    Education Law Center-PA

    9.    Georgia Advocacy Office

    10.    Judge David L. Bazelon Center for Mental Health Law

    11.    National Association of Rights Protection and Advocacy

    12.    National Center for Learning Disabilities

    13.    National Disability Rights Network

14.    National Women's Law Center

*Counsel for Amici Curiae*

15.    Kazlow, Jordan

16.    McDermott Will & Emery LLP

17.    Salgado, Richard D.

18.    Stefanova, Marina

19.    Webb, Kaylynn

*Appellants*

20.    M.F. by and through J.C.

21.    D.G. by and through D.G.

22.    E.M. by and through B.M.

23.    A.W. by and through J.W.

*Counsel for Appellants*

24.    Ballard, David Scott

25.    Ballard Law Office, LLC

26.    Gassert, Mikela Morgan

**A.W. BY AND THROUGH J.W., ET AL. V. COWETA COUNTY SCHOOL SYSTEM, ET AL.**

27.    Whitehead, Jin

*Appellees and Counsel for Appellees*

28.    Barnett, Beth

29.    Copeland, Andrew

30.    Coweta County School System

31.    Dees, Amy

32.    Elm Street Elementary School

33.    Farmer, Frank

34.    Freeman, Mathis & Gary, LLP

35.    Guy, Marc

36.    Hendrix, Shannon

37.    Hildebrand, Christi

38.    Hill, Michael M.

39.    Horton, Evan

40.    Jackson, Dean

41.    Kesselring, Ken

**A.W. BY AND THROUGH J.W., ET AL. V. COWETA COUNTY SCHOOL SYSTEM, ET AL.**

42.   Marshall, Nicole

43.   Melnick, Wayne Steven

44.   Menk, Linda

45.   Robertson, Larry

46.   Sprague, Catherine

47.   Walden, Melinda

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT ................................................................. C-1

TABLE OF CONTENTS .........................................................................i

TABLE OF CITATIONS ....................................................................... iii

STATEMENT OF *AMICI CURIAE*'S IDENTITY, INTEREST, AND
AUTHORITY TO FILE.......................................................................1

STATEMENT OF THE ISSUES ............................................................3

SUMMARY OF THE ARGUMENT......................................................4

ARGUMENT AND CITATIONS OF AUTHORITY ...........................6

I.      *Cummings* Does Not Preclude Compensatory Damages Other
        Than Those For Emotional Distress. .........................................6

        A.      *Cummings* Only Addresses the Availability of Damages
                for Emotional Distress. ....................................................7

        B.      The Court's Quasi-Contract Analogy Does Not Preclude
                Compensatory Damages Broadly. ..................................10

II.     Finding That Emotional Distress Damages Are Unavailable
        Under Title II Of The ADA Would Contradict The Statute And
        Undermine Its Purpose. ...........................................................14

III.    Emotional Distress And Other Compensatory Damages Are A
        Critical Remedy For Discrimination Victims. .........................21

        A.      Congress and This Court Have Recognized That
                Injunctive Relief Alone Is Not an Adequate Remedy for
                Intentional Discrimination for Individuals with
                Disabilities. ....................................................................21

B.     Both Emotional Distress and Other Compensatory Damages Are Essential in Safeguarding Civil Rights Against All Forms of Discrimination. ...........................................23

CONCLUSION .................................................................................29

CERTIFICATE OF COMPLIANCE ..................................................31

CERTIFICATE OF SERVICE .............................................................32

ADDENDUM..................................................................................... A-1

# TABLE OF CITATIONS

**Page(s)**

## Cases

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
  548 U.S. 291 (2006)...................................................................8

*Barnes v. Groman*,
  536 U.S. 181 (2002)..............................................................*passim*

*Bell v. Hood*,
  327 U.S. 678 (1946)...................................................................11

*Chaitram v. Penn Medicine-Princeton Med. Ctr.*,
  No. 21-17583, 2022 WL 16821692 (D.N.J. Nov. 8, 2022)............................13

*Coleman v. Zatechka*,
  824 F. Supp. 1360 (D. Neb. 1993)..................................................25

*Cummings v. Connell*,
  402 F.3d 936 (9th Cir. 2005), *amended*, No. 03-17095, 2005 WL
  1154321 (9th Cir. May 17, 2005) ..................................................13

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
  142 S. Ct. 1562 (2022)............................................................*passim*

*Delano-Pyle v. Victoria County*,
  302 F.3d 567, 570 (5th Cir. 2002)..............................................27, 28

*Doe v. Fairfax Cnty. Sch. Bd.*,
  No. 1:18-cv-00614, 2023 WL 424265 (E.D. Va. Jan. 25, 2023).....................11

*Doe v. Purdue Univ.*,
  No. 18-CV-89-JEM, 2022 WL 2828238 (N.D. Ind. July 20,
  2022) ...............................................................................11

*Duvall v. County of Kitsap*,
  260 F.3d 1124 (9th Cir. 2001), *as amended on denial of reh'g*
  (Oct. 11, 2001)..................................................................28, 29

*Franklin v. Gwinnett Cty. Pub. Sch.*,
  503 U.S. 60 (1992) ....................................................................................*passim*

*Heart of Atlanta Motel, Inc. v. United States*,
  379 U.S. 241 (1964) .........................................................................................5

*Ingram v. Kubik*,
  30 F.4th 1241 (11th Cir. 2022) .......................................................................19

*King v. Burwell*,
  576 U.S. 473 (2015) .........................................................................................20

*McCullum v. Orlando Reg'l Healthcare Sys., Inc.*,
  768 F.3d 1135 (11th Cir. 2014) ..................................................................21, 22

*Memphis Cmty. Sch. Dist. v. Stachura*,
  477 U.S. 299 (1986) .........................................................................................22

*Miener v. Missouri*,
  673 F.2d 969 (8th Cir. 1982) ......................................................................15, 16

*Montgomery v. District of Columbia*,
  2022 WL 1618741 (D.D.C. May 23, 2022) .....................................................12

*Pederson v. Louisiana State University*,
  213 F.3d 858 (5th Cir. 2000) ..........................................................................26

*Prakel v. Indiana*,
  100 F. Supp. 3d 661 (S.D. Ind. 2015) ............................................................28

*Salinas v. City of New Braunfels*,
  557 F. Supp. 2d 771 (W.D. Tex. 2006) ...........................................................28

*Scarlett v. School of Ozarks, Inc.*,
  780 F. Supp. 2d 924 (W.D. Mo. 2011) ............................................................26

*Sheely v. MRI Radiology Network, P.A.*,
  505 F.3d 1173 (11th Cir. 2007) .......................................................................22

*Stinson as next friend of K.R. v. Maye*,
  824 F. App'x 849 (11th Cir. 2020) ............................................................26, 27

*Tennessee v. Lane*,
541 U.S. 509 (2004).........................................................21

*United States v. Florida*,
938 F.3d 1221 (11th Cir. 2019).......................................15

*Uzuegbunam v. Preczewski*,
141 S. Ct. 792 (2021).....................................................13

*Wade v. Univ. Med. Ctr. of S. Nevada*,
No. 2:18-CV-01927-RFB-EJY (D. Nev. Feb. 13, 2023) ................................13

**Statutes**

29 U.S.C. § 794a...........................................................15

42 U.S.C. § 12101(a) ....................................................14, 21

42 U.S.C. § 12101(b)..................................................6, 14, 18

Americans with Disabilities Act ..............................*passim*

Americans with Disabilities Act, the ADA Amendments Act of
2008...............................................................................5

Section 504 of the Rehabilitation Act, 42 U.S.C. § 12133 .......................*passim*

**Other Authorities**

11 W. Jaeger, Williston on Contracts § 1341 (3d ed. 1968) ...............9

135 Cong. Rec. S10755 (daily ed. Sept. 7, 1989).................................16

Americans with Disabilities Act of 1989: Hearings on S. 933
before the Senate Committee on Labor and Human
Resources and the Subcommittee on the Handicapped, 101st
Cong., 1st Sess. (1989) (May, June 1989 Hearings).....................17

C. McCormick, Law of Damages § 145 (1935) ...........................9

Corbin on Contracts § 55.11.......................................................10

D. Laycock & R. Hasen, Modern American Remedies (5th ed. 2019) ................................................................................9

E. Farnsworth Contracts § 12.17 (1982).............................................9

Fourteenth Amendment.............................................................*passim*

H.R. Rep. No. 101-485 (III) (1990) ...............................................15, 16

J. Perillo, Calamari & Perillo on Contract § 14.5 (6th ed. 2009).......................9

Restatement (Second) of Contracts § 347.........................................10

S. Rep. No. 88-872 (1964) .............................................................5

*Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties*, 62 Fed. Reg. 12034, 12034, 12041 (1997)...........................................................27

Williston on Contracts § 64:1 ..........................................................10

## STATEMENT OF *AMICI CURIAE*'S
## IDENTITY, INTEREST, AND AUTHORITY TO FILE[1]

*Amici curiae* are disability rights and other civil rights organizations that have a substantial interest in this matter because the Court's decision will impact the legal rights of persons with disabilities along with the remedies available for violations of the Americans with Disabilities Act ("ADA")—specifically, the availability of emotional distress and other compensatory damages, which are essential remedies for injuries caused by illegal discrimination.

The Addendum to this Brief includes the statements of interest of *amici curiae*, namely Alabama Disabilities Advocacy Program, Autistic Self Advocacy Network, Center for Public Representation, Disability Rights Bar Association, Disability Rights Education & Defense Fund, Disability Rights Florida, Education Law Center-PA, Georgia Advocacy Office, Judge David L. Bazelon Center for Mental Health Law, National Association of Rights

---

[1]     Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *Amici* state that: (i) there is no party or counsel for a party in the pending appeal who authored the *amicus* brief in whole or in part; (ii) there is no party or counsel for a party in the pending appeal who contributed money that was intended to fund preparing or submitting the brief; and (iii) no person or entity contributed money that was intended to fund preparing or submitting the brief, other than *Amici* and their members.

Protection and Advocacy, National Center for Learning Disabilities, National Disability Rights Network, and National Women's Law Center.[2]

---

[2] *Amici curiae* timely filed their original Brief in Support of Plaintiffs-Appellants on April 5, 2023. Doc. 22-2. Because National Federation of the Blind inadvertently joined both this and the other *amicus* brief submitted in this case (Doc. 30-2), National Federation of the Blind is now withdrawing from the group of *amici* represented by the undersigned. This Corrected Brief (and the Corrected Motion for Leave to File *Amicus Curiae* Brief to which the brief is attached) are filed solely to reflect that National Federation of the Blind is not among the group of *amici* represented by the undersigned.

## STATEMENT OF THE ISSUES

*Amici curiae* support and agree with Plaintiffs-Appellants' Statement of the Issues, but file this Brief to call particular attention to the following issues:

(1)　　Whether the district court erred in dismissing Plaintiffs-Appellants' ADA Title II claims under *Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562 (2022), where Plaintiffs-Appellants seek compensatory damages not based on emotional distress?

(2)　　Whether the district court erred by improperly extending *Cummings'* reasoning (which is explicitly based on the Rehabilitation Act and Affordable Care Act, both of which Congress enacted under the Spending Clause) to Title II of the ADA—a statute that was not before the Supreme Court in *Cummings*, is *not* enacted under (or limited by) the Spending Clause, and that has different statutory language—thereby precluding emotional distress damages?

**SUMMARY OF THE ARGUMENT**

Without this Court's intervention, the decision below threatens a dangerous and incorrect expansion of the Supreme Court's recent decision in *Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562, 1571–72 (2022). Indeed, this case presents the first opportunity for any federal appellate court to rule on *Cummings'* effect on Title II of the ADA. Accordingly, *Amici* submit this brief—informed by their experience litigating discrimination cases across various circuits—to clarify these issues.

First, the district court's decision improperly further expands on *Cummings* to preclude not only emotional distress damages, but also other non-emotional compensatory damages. *Cummings*, however, never addressed let alone disallowed such other damages. There is no basis in Supreme Court precedent, this Court's precedent, the statute's text, or the legislative history to do so. If not corrected, however, the district court's decision will not only deprive the Plaintiffs-Appellants of valid claims, but will seed confusion on this important issue among other courts.

Second, the decision below applies *Cummings* to a law—the ADA— that *Cummings* did not address, and which Congress enacted *not* under the Spending Clause, but under its Fourteenth Amendment and Commerce

powers. Put simply, when Congress sought to prevent discrimination against those with disabilities, it did so under its sovereign authority, which is broader and less limited with respect to potential remedies. And as the legislative history and codified findings and purposes show, Congress meant to fully deploy those remedies here. To apply *Cummings* in this context is to dictate an outcome that Congress itself plainly never foresaw, let alone intended.

The stakes are high. Emotional distress damages are an essential—and sometimes the only—means of redressing the injuries suffered by victims of discrimination. This non-economic harm is inherent in discrimination, encompassing the humiliation, frustration, and embarrassment that a person must surely feel . . . ." *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 292 (1964) (Goldberg, J., concurring) (quoting S. Rep. No. 88-872, at 16 (1964)). There is often no other remedy to compensate for these unique dignitary harms. Yet the district court's decision—by extending *Cummings* beyond the specific Spending Clause acts that were before the Supreme Court in that case—would make emotional distress damages and indeed potentially even other compensatory damages unavailable under Title II.

**ARGUMENT AND CITATIONS OF AUTHORITY**

**I.** *Cummings* **Does Not Preclude Compensatory Damages Other Than Those For Emotional Distress.**

As discussed in Section II, the district court erred by applying *Cummings* to preclude damages for emotional distress under Title II of the ADA.[3]  But reversal is required before even reaching that argument because the district court erred by exceeding the holding of *Cummings* to exclude not just claims for emotional distress, but also for other compensatory damages. There is no plausible reading of *Cummings* that supports that outcome.  The district court's broad application of *Cummings* is error.  This Court should take this opportunity to swiftly correct it.

Plaintiffs-Appellants' proposed amended complaint sought damages not only for emotional distress, but also "physical harm and other compensatory damages and relief," as well as such "further relief as the

---

[3]    As discussed more fully in Plaintiffs-Appellants' brief (Plaintiffs-Appellants' Opening Brief at 12–23) and this brief (*infra*, Section II), the Supreme Court's analysis in *Cummings* begins and ends with the Rehabilitation Act's enactment as Spending Clause legislation.  142 S. Ct. at 1570.  The quasi-contract analogy on which the Court relies to hold that emotional distress damages are unavailable does not apply to Title II, which was enacted pursuant to Congress's "power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities."  42 U.S.C. § 12101(b)(4).

6

court deems just and proper." Doc. 18-1 — Pg. 31–32.[4] The district court denied Plaintiffs-Appellants' motion for leave to amend as futile without acknowledging those other damages claims. *Cummings* does not require this outcome: the Supreme Court only addressed emotional distress damages and not broad compensatory damages as pleaded in Plaintiffs-Appellants' proposed amended complaint. And, had the Court considered compensatory damages more broadly, such damages *are* traditional contract damages that would be available even under the quasi-contract framework on which it relies.

A. *Cummings* **Only Addresses the Availability of Damages for Emotional Distress.**

In *Cummings*, a deaf and legally blind individual was denied a sign language interpreter when receiving physical therapy services. 142 S. Ct. at 1568–69 (internal quotation marks omitted). The "only compensable injuries that [plaintiff] alleged [defendant] caused were humiliation, frustration, and emotional distress." *Id*. at 1569. The Supreme Court in *Cummings* thus considered only the narrow question of whether "compensatory damages

---

[4]     Pursuant to Eleventh Circuit Rule 28-5, references to the record conform to the following format: Doc. <district court docket number> — Pg. <page number>.

*for emotional distress* are available under the implied Title VI cause of action."

*Id.* at 1576 (Kavanaugh and Gorsuch, J.J., concurring) (emphasis added).

The Court's analysis began and ended with the Rehabilitation Act's enactment as Spending Clause legislation. *Id.* at 1570.[5] Because Spending Clause legislation operates as a quasi-contract between the federal government and recipients of federal aid, the Court considered whether "a prospective funding recipient, at the time it 'engaged in the process of deciding whether to accept federal dollars, [would] have been aware that it would face such liability." *Id.* at 1570–71 (quoting *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006)). The Court answered this, with respect to those specific statutes before it in *Cummings*, by looking to treatises on contract law in which it found that "emotional distress is generally not compensable in contract." *Id.* at 1571.

Each of the Court's cited sources is narrowly focused on damages for emotional distress and *not* compensatory damages more broadly. *See* D.

---

[5] The Supreme Court also made clear that its opinion directly applied to *only* "the Rehabilitation Act and the Affordable Care Act—the two statutes directly at issue in this litigation." *Cummings*, 142 S. Ct. at 1569; *see also id.* at 1576 (holding "that emotional distress damages are not recoverable under the Spending Clause antidiscrimination statutes *we consider here*") (emphasis added).

Laycock & R. Hasen, Modern American Remedies 216 (5th ed. 2019) ("*emotional distress* is generally not compensable in contract") (emphasis added); 11 W. Jaeger, Williston on Contracts § 1341, p. 214 (3d ed. 1968) ("*Mental suffering* caused by breach of contract, although it may be a real injury is not generally allowed as a basis for compensation in contractual actions") (emphasis added); E. Farnsworth Contracts § 12.17, p. 894 (1982) (rule of "generally denying recovery for *emotional disturbance* or '*mental distress'* resulting from breach of contract") (emphasis added); J. Perillo, Calamari & Perillo on Contract § 14.5, p. 495 (6th ed. 2009) (Calamari & Perillo) ("As a general rule, no damages will be awarded for the *mental distress or emotional trauma* that may be caused by a breach of contract.") (emphasis added); C. McCormick, Law of Damages § 145, p. 592 (1935) ("It is often stated as the 'general rule' that, in actions for breach of contract, damages for *mental suffering* are not allowable.") (emphasis added).

The Court never considered any other forms of compensatory damages. Its holding, which is narrowly focused on damages for emotional distress, cannot be read to have a broader application.

**B.**     **The Court's Quasi-Contract Analogy Does Not Preclude Compensatory Damages Broadly.**

Setting aside whether the Court's quasi-contract analogy is applicable to Title II, compensatory damages are traditionally awarded for breaches of contract.   And such damages should be available here regardless of the framework applied.

The same treatises the Court relied on in *Cummings* to find that damages for emotional distress are not a traditional remedy for a breach of contract show that other compensatory damages very much are a traditional remedy:

- **Restatement (Second) of Contracts § 347**: "[T]he injured party has a right to damages based on his expectation interest as measured by (a) the loss in value to him of the other party's performance caused by its failure or deficiency, plus (b) any other loss, including incidental or consequential loss, caused by the breach, less (c) any cost or other loss that he has avoided by not having to perform."

- **Williston on Contracts § 64:1**: "The fundamental principle that underlies the availability of contract damages is that of compensation."

- **Corbin on Contracts § 55.11:** "Compensatory Damages – The General Standard."

The general rule is that "[w]here legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal

courts may use *any available remedy* to make good the wrong done." *Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60, 66 (1992) (emphasis added) (quoting *Bell v. Hood*, 327 U.S. 678, 684 (1946)). In *Barnes v. Gorman*, the Supreme Court recognized some potential limitations on damages available for private rights of action brought pursuant to Spending Clause legislation, but in doing so noted specifically that at a minimum "under Title IX, which contains no express remedies a recipient of federal funds is nevertheless subject to suit for *compensatory damages, and injunction*, forms of relief *traditionally available in suits for a breach of contract*." 536 U.S. 181, 187 (2002) (emphasis added).[6]

Such compensatory damages for discrimination may include damages for lost opportunities, including, as Plaintiffs-Appellants suffered here, loss of educational opportunities. *See Doe v. Fairfax Cnty. Sch. Bd.*, No. 1:18-cv-00614, 2023 WL 424265, at *4 (E.D. Va. Jan. 25, 2023) ("Several post-*Cummings* district courts have allowed plaintiffs to seek recovery for lost opportunities

---

[6] While *Barnes* addressed Title IX, it is important to note that *Cummings* addressed only other Spending Clause legislation in the Rehabilitation Act and ACA. *See Doe v. Purdue Univ.*, No. 18-CV-89-JEM, 2022 WL 2828238, at *4 (N.D. Ind. July 20, 2022) ("Because *Cummings* was not a Title IX action, it does not make evidence of emotional distress or harm inadmissible in this case.").

they suffered as a result of discrimination in violation of Spending Clause statutes."). The U.S. District Court for the Eastern District of Virginia recently examined the availability of compensatory damages for lost opportunities under Title IX—a Spending Clause statute—post-*Cummings.* The court concluded that "losses of educational opportunities remain recoverable post-*Cummings*." *Id*. at *5. In reaching this conclusion, the court returned to the key question in *Cummings*: "whether such damages are 'traditionally available in suits for breach of contract.'" *Id*. at *4 (quoting *Cummings*, 142 S. Ct. at 1571). It determined that "compensatory damages that are not based upon specific monetary harm but stem directly from lost opportunities suffered as a result of discrimination can nonetheless serve as a basis for damages in private right of action cases based on Spending Clause statutes." *Id*. at *5.

Other courts have likewise found that compensatory damages remain available for discrimination post-*Cummings*. *See, e.g.*, *Montgomery v. District of Columbia*, 2022 WL 1618741, at *25 (D.D.C. May 23, 2022) (holding that while *Cummings* barred damages for emotional distress, other injuries could support an award of compensatory damages, including damages arising from plaintiff's loss of an opportunity to engage in interrogations); *see*

*Chaitram v. Penn Medicine-Princeton Med. Ctr.*, No. 21-17583, 2022 WL 16821692, at *2 (D.N.J. Nov. 8, 2022) (holding plaintiff had "an expectation interest in the ability to fully participate in her own medical care through effective communication" and that compensatory damages under a loss of opportunity theory were therefore recoverable).

The importance of nominal damages should also not be discounted; "in the context of antidiscrimination cases, nominal damages serve an important purpose, since 'every violation of a right imports damage.'" *Wade v. Univ. Med. Ctr. of S. Nevada*, No. 2:18-CV-01927-RFB-EJY (D. Nev. Feb. 13, 2023) (Doc. 56 at 8) (quoting *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 802 (2021) (Roberts, C.J., dissenting)). "Nominal damages serve one other function, to clarify the identity of the prevailing party for the purposes of awarding attorney's fees and costs in appropriate cases." *Cummings v. Connell*, 402 F.3d 936, 943 (9th Cir. 2005), *amended*, No. 03-17095, 2005 WL 1154321 (9th Cir. May 17, 2005*)*.

There is no basis for the district court's expansive interpretation of *Cummings* in either the Supreme Court's opinion or in contract law. The district court's overly broad reading of *Cummings*, which threatens to

severely limit damages in nearly all cases of discrimination, demands correction.

## II. Finding That Emotional Distress Damages Are Unavailable Under Title II Of The ADA Would Contradict The Statute And Undermine Its Purpose.

Congress codified its purposes in enacting the ADA: "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities;" "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities;" and "to invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities." 42 U.S.C. § 12101(b)(1), (2), (4). Congress particularly found that "individuals who have experienced discrimination on the basis of disability have often had no legal recourse to redress such discrimination." *Id.* at § 12101(a)(4). In other words, Congress found that current laws were inadequate to prevent and remedy the discrimination being experienced by people with disabilities.

To achieve its purpose, Congress meant to confer compensatory damages, including emotional distress damages, as part of the remedies available for violations of Title II of the ADA.

Based on its then-understanding, Congress chose to tie the remedies for Title II to Section 504 of the Rehabilitation Act, 42 U.S.C. § 12133. *See United States v. Florida*, 938 F.3d 1221, 1227 (11th Cir. 2019).[7]  By doing so, Congress meant to confer emotional-distress damages as part of the "full panoply of remedies" that are available for violations.  H.R. Rep. No. 101-485 (III), at 52 (1990).  In contemplating the range of remedies available, Congress expressly looked to *Miener v. Missouri*, 673 F.2d 969 (8th Cir. 1982), in which the court held that a student with disabilities had stated a valid

---

[7]  Congress did so by reference.  42 U.S.C. § 12133 provides: "The remedies, procedures, and rights set forth in section 794a of Title 29 shall be the remedies, procedures, and rights this subchapter provides to any person alleging discrimination on the basis of disability in violation of section 12132 of this title."  Differently stated, Title II's enforcement provision incorporates the remedy provision of Section 505 of the Rehabilitation Act of 1973.  In turn, 29 U.S.C. § 794a incorporates selected remedy provisions of the Civil Rights Act of 1964, including remedies available under Titles VI and VII of the 1964 Act.  *See* 29 U.S.C. § 794a ("The remedies, procedures, and rights set forth in section 717 of the Civil Rights Act of 1964 . . . shall be available, with respect to any complaint under section 791 of this title" and "The remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 . . . shall be available.").

claim for damages under Section 504 of the Rehabilitation Act based on the denial of access to educational resources. *See* H.R. Rep. No. 101-485 (III), at 52 n.62 (discussing *Miener*); *Miener*, 673 F.2d at 978 (concluding "damages are awardable under [Section] 504" based on the "presumption . . . that a wrong must find a remedy, and in light of the inadequacy of administrative remedies").

Indeed, Section 504—at that time—provided for that full range of potential damages and Congress unmistakably meant to include that full range. In floor debates, Senator Harkin, who was the Act's chief Senate sponsor, stated: "Title II of the bill makes available the rights and remedies also available under section 505 of the Rehabilitation Act, and damages remedies are available under that provision enforcing section 504 of the Rehabilitation Act and, therefore, also under title II of this bill."[8] Further, in questioning the Attorney General of Illinois about Illinois' discrimination-related laws, Senator Harkin asked if Illinois law includes damages. The Attorney General confirmed that Illinois does permit punitive and traditional damages and injunctive relief. In response, Senator Harkin

---

[8]    135 Cong. Rec. S10755 (daily ed. Sept. 7, 1989).

stated, "We had testimony yesterday that said we shouldn't have damages in [the ADA], and I'm glad that you say why remedies are so necessary."[9]

Congress, however, could not predict that 30-plus years later, the Supreme Court would strike emotional distress damages as an available remedy under the Rehabilitation Act and—by extension, according to the district court—sweep away those damages under Title II. The range of damages under Section 504 first began to erode when the Supreme Court applied a contract analogy in *Barnes* to hold that punitive damages were not available under either Section 504—which Congress enacted under the Spending Clause—or Title II.

Justice Stevens foresaw the potential problems now manifesting in this case and warned then that "Title II of the ADA, was not enacted pursuant to the Spending Clause," that the Court's earlier rulings said "nothing about the remedy that might be appropriate for such a breach," and that the Court's ruling would have "potentially far-reaching consequences that go well beyond the issues briefed and argued in this case." *Barnes*, 536 U.S. at

---

[9]     Americans with Disabilities Act of 1989: Hearings on S. 933 before the Senate Committee on Labor and Human Resources and the Subcommittee on the Handicapped, 101st Cong., 1st Sess. at 81 (1989) (May, June 1989 Hearings).

192–93 (Stevens, J., concurring).  The majority dismissed those concerns, however, in a footnote:

> We cannot understand Justice Stevens' Chicken–Little statement that today's decision "has potentially far-reaching consequences that go well beyond the issues briefed and argued in this case." . . . We do not imply, for example, that suits under Spending Clause legislation are suits in contract, or that contract-law principles apply to all issues that they raise.

*Id*. at 188 n.3.

The district court's decision below disastrously fulfills Justice Stevens' warning twenty years ago with a far-reaching consequence:  the outright denial of one of the most important remedies that Congress meant to bestow when it enacted Title II.

But this reasoning has a critical gap.  Unlike with the Rehabilitation Act, and as Justice Stevens noted in *Barnes*, Congress did *not* enact the ADA under the Spending Clause.  Instead, Congress enacted the ADA as a "nonspending statute" through its broader Fourteenth Amendment and Commerce powers.  42 U.S.C. § 12101(b)(4) (congressional purpose "invok[ing] the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce").  Title II therefore is *not* subject to the same limitations as the Spending Clause acts.

The contract analogy that the Supreme Court relied on in *Cummings*—and which was the basis for preclusion of emotional distress damages—therefore has no direct application to the ADA.[10]

It defies reality to hold that Congress would have intentionally subjected a law it enacted under its Fourteenth Amendment and Commerce powers to the narrower limitations imposed on a law enacted under its Spending Clause powers. Congress did no such thing. Indeed, far from legislative intent, this was at most a legislative oversight: Congress could not predict that, 30-plus years later, the Supreme Court would strike emotional distress damages as an available remedy under the Rehabilitation Act.

Because the Supreme Court did not decide *Cummings* until several decades after the passage of the ADA, Congress had no notice that the Supreme Court would limit this "full panoply" of remedies as excluding emotional damages. Put simply, Congress was not "legislating with full cognizance of" the *Cummings* decision. *See Franklin*, 503 U.S. at 72 ("In the

---

[10]     This Court previously rejected drawing a distinction between Title II and Spending Clause legislation as "foreclosed" by *Barnes*. *See Ingram v. Kubik*, 30 F.4th 1241, 1258–59 (11th Cir. 2022). That case, however, dealt with the availability of vicarious liability, which is not at issue here.

years *after* the announcement of *Cannon*, on the other hand, a more traditional method of statutory analysis is possible, because Congress was legislating with full cognizance of that decision.").

But Congress's legislative oversight does not bind the Court here. While "[r]eliance on context and structure in statutory interpretation is a 'subtle business, calling for great wariness lest what professes to be mere rendering becomes creation and attempted interpretation of legislation becomes legislation itself,'" *King v. Burwell*, 576 U.S. 473, 497 (2015), Congress's intent was clear and transcended the Spending Clause limitations that affected the Rehabilitation Act. *See, e.g.*, *id.* at 494 ("It is implausible that Congress meant the Act to operate in this manner.").

The ADA's national mandate to prevent discrimination would be undermined and replaced with a patchwork of state laws if the district court's decision eviscerating the remedies recoverable under Title II were affirmed.

## III. Emotional Distress And Other Compensatory Damages Are A Critical Remedy For Discrimination Victims.

### A. Congress and This Court Have Recognized That Injunctive Relief Alone Is Not an Adequate Remedy for Intentional Discrimination for Individuals with Disabilities.

In passing the ADA, Congress recognized that "society has tended to isolate and segregate individuals with disabilities" and that "such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem[.]" 42 U.S.C. § 12101(a)(2). Congress specifically found that "discrimination against individuals with disabilities persists in such critical areas as employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services[.]" 42 U.S.C. § 12101(a)(2).

The private enforcement mechanism under Title II of the ADA redresses and deters such discrimination through the award of damages for intentional acts of discrimination. *See Tennessee v. Lane*, 541 U.S. 509, 517 (2004) (Title II's enforcement provision "authorizes private citizens to bring suits for money damages"); *McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1146–47 (11th Cir. 2014) ("To prevail on a claim for

compensatory damages under either the RA or the ADA, a plaintiff must show that a defendant violated his rights under the statutes and did so with discriminatory intent.").  But this private enforcement mechanism is meaningless without the availability of emotional distress and other compensatory damages.

First, many cases of discrimination based on disability do not result in significant out-of-pocket or pecuniary damages.  Instead, the primary injury is often mental or emotional harm.  In such cases, damages for "emotional distress [are] the . . . *only* 'available remedy to make good the wrong done.'" *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1203 (11th Cir. 2007) (emphasis in original) (quoting *Franklin*, 503 U.S. at 66).  This Court has recognized that "[a]s a matter of both common sense and case law, emotional distress is a predictable, and thus foreseeable, consequence of discrimination."  *Id*. at 1199 (collecting cases where violations of anti-discrimination statutes resulted in emotional distress).  In sum, "emotional damages are plainly a form of compensatory damages designed to 'make good the wrong done.'"  *Id.* (quoting *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986)).  To hold that they are unavailable to victims of disability discrimination will often mean that they have no remedy at all.

Second, in cases where plaintiffs also seek other compensatory damages, such as damages for pain and suffering and nominal damages—as Plaintiffs-Appellants have done here—to deprive them of these additional remedies would even further strip Title II of its private enforcement mechanism.

And, even though injunctive relief may also be available if the plaintiff has standing to pursue it, the Supreme Court has recognized, in the context of Title IX, that such relief is often "clearly inadequate." *See Franklin*, 503 U.S. at 76. For instance, where the plaintiff is unlikely to interact with the defendant again, such "prospective relief accords [] no remedy at all." *Id.* Moreover, even where injunctive relief is available, it does not provide a financial deterrent to future discrimination. Nor does it provide compensation for the injuries suffered because of past discrimination.

## B. Both Emotional Distress and Other Compensatory Damages Are Essential in Safeguarding Civil Rights Against All Forms of Discrimination.

This case concerns discrimination in the disability context and specifically under Title II of the ADA. Discrimination, however, is a broader problem addressed by many other statutes. The following section draws from that broader range of discrimination cases to illustrate a simple but

important principle: all forms of compensatory damages, including emotional distress and also other damages, are essential.

The purpose and effectiveness of the broader framework of anti-discrimination laws in remedying and preventing discrimination in all its forms also depend on the ability of victims of discrimination to seek emotional distress and other compensatory damages. *Cummings* has already affected that framework—and the outcome of some of these cases below may now be different under *Cummings*—but the history of discrimination cases that pre-date *Cummings* still provides important evidence of the importance of complete damages remedies.

Prior to *Cummings*, courts routinely held that victims of discrimination (including discrimination not only based on disability, but on race and sex) could recover for emotional distress and other compensatory damages in suits against recipients of federal funds. Those cases illustrate the profound trauma and disadvantages that discrimination in all its forms can inflict, and they recognize the necessity of emotional and other compensatory damages in such situations. But viewing these cases in light of the district court's ruling here also demonstrates that, if these victims of discrimination were deprived of compensatory damages for emotional and other harms (as the

district court here held as to Plaintiffs-Appellants), they would be left with no remedy, or a remedy that is woefully inadequate.

This potential loss of civil rights protections affects individuals in a wide range of contexts. Specifically, discrimination in the education setting can cause severe and lasting emotional and psychological harm and drastically impede a student's educational opportunities. Courts have historically been particularly cognizant of this fact and have routinely held that compensatory damages (including for emotional distress) are recoverable in such circumstances. To be sure, *Cummings* has now expressly precluded emotional distress damages in many of these contexts and—if decided today—the outcomes may be different. The facts of these prior cases, however, are testament to the critical need for such damages to combat and remediate discrimination of all kinds.

For instance, in *Coleman v. Zatechka*, a university refused to assign a roommate to a student who had cerebral palsy, used a wheelchair, and needed personal attendant services. 824 F. Supp. 1360, 1362 (D. Neb. 1993). The student was awarded damages for the isolation, segregation, and stigmatization she experienced as a result of the university's ADA violations. *Id*. at 1373–74.

In *Scarlett v. School of Ozarks, Inc.*, a college refused to allow a student to stay in dorms on campus because of his race. 780 F. Supp. 2d 924, 933 (W.D. Mo. 2011). The court held that the student stated a Title VI claim for discrimination on the basis of race against the college, and it expressly held that the student could recover damages for the mental anguish and emotional distress he suffered if proved at trial. *Id.* at 934.

In *Pederson v. Louisiana State University*, the Fifth Circuit held that female athletes stated a claim—and could recover monetary damages—against a university for its intentional discrimination, as evidenced by the university's perpetuation of "antiquated stereotypes" about female athletes and "a grossly discriminatory athletics system." 213 F.3d 858, 876, 881, 884 (5th Cir. 2000).

Sex discrimination can also include sexual assault and harassment, which can result in additional fear and trauma. *See Stinson as next friend of K.R. v. Maye*, 824 F. App'x 849, 860 (11th Cir. 2020) (school's "deliberate indifference through its actions and inactions caused [student] to undergo

sexual harassment" and "to be more vulnerable to the effects of the sexual harassment she suffered").[11]

Discrimination can also erode basic protections during encounters with law enforcement and juridical proceedings. But without emotional or other compensatory damages, plaintiffs would be left with no remedy and no mechanism to vindicate their rights. For instance, in *Delano-Pyle v. Victoria County*, the plaintiff, who was deaf, was involved in a car accident. 302 F.3d 567, 570 (5th Cir. 2002). When the police arrived, they ordered him to perform three sobriety tests without providing him with an interpreter. *Id.* Because the plaintiff could not understand the officers' instructions, the officers concluded that the plaintiff was unable to complete them and arrested him for drunk driving. *Id.* at 570–71. Law enforcement again failed to provide the plaintiff with an interpreter at the police station during his Miranda warnings and subsequent interrogations. *Id.* at 571.

---

[11]     Indeed, decades ago, the Department of Education recognized that the "elimination of sexual harassment of students in federally assisted educational programs [as] a high priority" because "sexual harassment can interfere with a student's" "emotional [] well-being" and "[h]ostile environment sexual harassment" can cause "mental or emotional distress." U.S. Dep't of Educ., Office for Civil Rights, *Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties*, 62 Fed. Reg. 12034, 12034, 12041 (1997).

The plaintiff prevailed on his claim that he suffered substantial fear, embarrassment, wrongful arrest, and unnecessary testing and interrogation because the officers failed to provide the needed accommodation under the ADA and RA. *Id.* The jury awarded him compensatory damages, which the Fifth Circuit upheld. *Id.* at 571, 576; *see also Salinas v. City of New Braunfels*, 557 F. Supp. 2d 771, 777 (W.D. Tex. 2006) (plaintiff stated claim under the ADA for discrimination based on her hearing disability, arising out of communication failures with police and other city personnel after she called 911 to report an emergency).

In *Prakel v. Indiana*, a criminal defendant and her deaf son sued for the denial of interpreter services during the mother's criminal proceedings. 100 F. Supp. 3d 661, 670–72 (S.D. Ind. 2015). The mother alleged that without an interpreter, the son "was unable to fully participate in court proceedings as a spectator and provide meaningful support thereafter." *Id.* at 672. The court held that the mother could recover the interpreter fees she paid to secure an interpreter, as well as damages for her emotional distress. *Id.* at 673. And in *Duvall v. County of Kitsap*, a litigant who was hearing-impaired was not provided real-time transcription during his marriage dissolution proceedings. 260 F.3d 1124, 1131 (9th Cir. 2001), *as amended on denial of reh'g*

(Oct. 11, 2001).  The court concluded that his ADA and Rehabilitation Act claims survived certain county officials' motion for summary judgment, noting that monetary damages are recoverable if the conduct is found to be intentional.  *Id*. at 1138–42.

*Cummings* has already impacted cases such as many of those above, but courts can avoid further destruction by interpreting and applying it cautiously, rather than by broad stroke.  A broad ruling such as the one below here will not only deprive individuals of a vital remedy for their injuries, but it will also destroy a key mechanism for preventing future discrimination.  Anti-discrimination statutes like the ADA would be rendered toothless, and Congress's goal and intent in enacting these statutes—irrelevant.

## CONCLUSION

For the foregoing reasons, the Court should reverse the district court's ruling.

Dated:  April 21, 2023          Respectfully submitted,

/s/ Richard D. Salgado
Richard D. Salgado
Marina Stefanova
Jordan Kazlow
Kaylynn Webb
MCDERMOTT WILL & EMERY LLP
2501 N. Harwood St., Ste. 1900
Dallas, Texas 75201
Tel: 214-210-2797
richard.salgado@mwe.com
mstefanova@mwe.com
jkazlow@mwe.com
kwebb@mwe.com

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

I certify, pursuant to Federal Rule of Appellate Procedure 32(g) and Eleventh Circuit Rule 28-1(m), that this brief complies with the type-volume limit of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because, excluding the portions of the brief exempted by Federal Rule of Appellate Procedure Rule 32(f), the brief contains 5,658 words.

I further certify that this brief complies with the typeface requirements and the type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft Word in a 14-point Book Antiqua font.

Dated: April 21, 2023                          */s/ Richard D. Salgado*
                                               Richard D. Salgado

**CERTIFICATE OF SERVICE**

I hereby certify that on April 21, 2023, I electronically filed a true and correct copy of the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit, using the CM/ECF system of the Court.  I certify that all participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: April 21, 2023                              */s/ Richard D. Salgado*
                                                   Richard D. Salgado

# ADDENDUM

## STATEMENTS OF INTEREST OF *AMICI CURIAE*

**Alabama Disabilities Advocacy Program** ("ADAP") is part of the National Disability Rights Network, the nonprofit membership organization for the federally funded Protection and Advocacy ("P&A") system. The P&A system constitutes the nation's largest provider of legal advocacy services for persons with disabilities including serious mental illness. As Alabama's only statewide, cross-disability, comprehensive legal advocacy organization, ADAP protects and promotes the civil rights of Alabamians with physical, cognitive, and mental health disabilities.

**Autistic Self Advocacy Network** ("ASAN") is a 501(c)(3) nonprofit organization run by and for autistic people. ASAN advocates to improve opportunity for, and the lives of, Americans with autism, and to ensure that the voices of autistic people are heard in policy debates in government and across society. ASAN's advocacy includes providing information to the public about autism and disability rights, and working to enforce the rights of autistic people to equal opportunity at school, at work, and throughout society.

**Center for Public Representation** ("CPR") is a public interest law firm that has been assisting people with disabilities for more forty years. It is both a statewide and national legal backup center that provides assistance and support to public and private attorneys who represent people with disabilities, and to the federally-funded protection and advocacy programs in each of the States. CPR has litigated systemic cases on behalf of persons with disabilities in more than twenty states, and submitted *amici* briefs to the United States Supreme Court and many of the courts of appeals in cases seeking to enforce the constitutional and statutory rights of persons with disabilities, including the right to be free from discrimination under the ADA.

**Disability Rights Bar Association** ("DRBA") is a group of disability rights lawyers from nonprofit advocacy groups, private law firms, and law professors who share a commitment to effective legal representation of individuals with disabilities. Members of DRBA are committed to supporting the fundamental civil rights of people with disabilities, which are often inadequately represented in our society, through litigation and other legal advocacy strategies that are highly effective and necessary to enforce and advance the rights of people with disabilities.

**Disability Rights Education & Defense Fund** ("DREDF"), based in Berkeley, California, is a national nonprofit law and policy center dedicated to advancing and protecting the civil rights of people with disabilities. Founded in 1979 by people with disabilities and parents of children with disabilities, DREDF remains board- and staff-led by the community it represents. DREDF pursues its mission through education, advocacy, and law reform efforts, and it is nationally recognized for its expertise in the interpretation of federal civil rights laws protecting persons with disabilities.

**Disability Rights Florida** ("DRF") is Florida's designated protection and advocacy system and provides protection and advocacy for persons with developmental disabilities, mental illness and other disabilities as authorized by Federal law. The mission of DRF is to advocate, investigate and litigate to protect and advance the rights, dignity, equal opportunities, self-determination, and choices for all people with disabilities. DRF is authorized to serve individuals with disabilities throughout our state who are impacted by and rely on the application of the Americans with Disabilities Act.

**Education Law Center-PA** ("ELC") is a non-profit, legal advocacy organization dedicated to ensuring that all children in Pennsylvania have

access to a quality public education by advancing the rights of children who are most marginalized by the education system. Over the course of its forty-seven-year history, ELC has handled thousands of individual matters and impact cases on behalf of children with disabilities, students impacted by deep poverty, children of color, those in the foster care and juvenile justice systems, English learners, LGBTQ students, and children experiencing homelessness. ELC has a long history of vigorous advocacy on behalf of students with disabilities and recognizes the critical importance of ensuring that students victimized by discrimination have access to compensatory damages and emotional distress damages to redress the non-economic harm caused by disability discrimination.

**Georgia Advocacy Office** ("GAO") is the designated Protection and Advocacy System for the State of Georgia. Its mission is to work with and for people who experience disabilities to protect against abuse and neglect and to ensure equal access to leading a good life within the community.

**Judge David L. Bazelon Center for Mental Health Law** ("Bazelon Center") is a national non-profit legal advocacy organization founded in 1972 to advance the rights of individuals with mental disabilities. The Bazelon Center uses litigation, public policy advocacy, education, and

training to advocate for laws and policies that ensure equal opportunities for people with mental illness or intellectual disability in all aspects of their lives, including the opportunity to participate fully in their communities.

**National Association of Rights Protection and Advocacy** ("NARPA") was formed in 1981 to provide support and education for advocates working in the mental health arena. NARPA monitors developing trends in mental health law and identifies systemic issues and alternative strategies in mental health service delivery on a national scale. Members are attorneys, people with psychiatric histories, mental health professionals and administrators, academics, and non-legal advocates—with many people in roles that overlap. Central to NARPA's mission is the promotion of those policies and strategies that represent the preferred options of people who have been diagnosed with mental disabilities. Approximately 40% of NARPA's members are current or former patients of the mental health system. NARPA members were key advocates for the passage of federal legislation such as the Americans with Disabilities Act, the ADA Amendments Act of 2008, and the Protection and Advocacy for Individuals with Mental Illness Act of 1986.

**National Center for Learning Disabilities** ("NCLD") is a national not-for-profit organization founded in 1977. The mission of NCLD is to improve the lives of the 1 in 5 children and adults nationwide with learning and attention issues—by empowering parents and young adults, transforming schools and advocating for equal rights and opportunities. NCLD works to create a society in which every individual possesses the academic, social, and emotional skills needed to succeed in school, at work, and in life.

**National Disability Rights Network** ("NDRN") is the non-profit membership organization for the federally mandated Protection and Advocacy ("P&A") and Client Assistance Program ("CAP") agencies for individuals with disabilities. The P&A and CAP agencies were established by the United States Congress to protect the rights of people with disabilities and their families through legal support, advocacy, referral, and education. There are P&As and CAPs in all 50 states, the District of Columbia, Puerto Rico, and the U.S. Territories (American Samoa, Guam, Northern Mariana Islands, and the US Virgin Islands), and there is a P&A and CAP affiliated with the Native American Consortium which includes the Hopi, Navajo and San Juan Southern Paiute Nations in the Four Corners region of the Southwest. Collectively, the P&A and CAP agencies are the

largest provider of legally based advocacy services to people with disabilities in the United States.

**National Women's Law Center** ("NWLC") is a nonprofit legal advocacy organization dedicated to advancing and protecting the legal rights of women and girls and all people to be free from sex discrimination, including sexual harassment and assault. Since 1972, NWLC has engaged in policy advocacy and participated as counsel or amicus curiae in a range of cases to secure equal opportunity in education, workplace justice, income security, child care, and reproductive rights and health, with particular attention to women and girls who face multiple and intersecting forms of discrimination. NWLC has participated as counsel or amicus curiae in a range of cases to secure the equal treatment of women and girls under the law.